# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MT. HAWLEY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No. 4:20-cv-01587-SEP ) |
| CITY OF RICHMOND HEIGHTS, MISSOURI | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff's Motion to Dismiss Defendant's Counterclaim. Doc. [19]. The motion is fully briefed and ready for disposition. Docs. [19], [27], [32]. For the reasons set forth below, the Court will grant Plaintiff's Motion.

### BACKGROUND

This case arises out of an insurance dispute between the City of Richmond Heights and Mt. Hawley Insurance Company over coverages contained in a commercial property insurance policy. Docs. [1], [15], [15-1]. The policy insures the City's anticipated sales tax revenues from the following five retail properties: the St. Louis Galleria, the Schnucks Richmond Center Development, The Boulevard St. Louis, The Crossings, and the Menards Development. Docs. [15] ¶¶ 1, 14, [15-1] at 5, 8. The COVID-19 pandemic began during the policy term. On March 17, 2020, the St. Louis County Executive issued an executive order closing all non-essential businesses, Doc. [15] ¶ 31, which curtailed the operation of some of the covered establishments. *Id.* ¶ 32.

In May of 2020, the City presented a claim to Mt. Hawley under its insurance policy seeking reimbursement for sales tax revenues that were lost from the five properties on account of the COVID-19 pandemic. *Id.* ¶¶ 35-36. On September 15, 2020, the City received notice that Mt. Hawley had rejected the claim. *Id.* ¶ 37. The parties attempted negotiations, which were unsuccessful, and then Mt. Hawley filed the present declaratory judgment action. Docs. [1], [15] ¶¶ 38-39. The City thereafter filed a Counterclaim, asserting five causes of action:

**Count I**: Breach of Contract

**Count II**: Vexatious Refusal to Pay

**Count III**: Fraud in the Inducement/Fraudulent Misrepresentation

>   **Count IV**:  Negligent Misrepresentation
>
>   **Count V**:  Breach of Fiduciary Duty

Doc. [15] at 6, 7, 8, 10, 11.

With respect to Count I, the City asserts coverage under three policy provisions: (1) the Business Income coverage provision, (2) the Civil Authority coverage provision, and (3) the Additional Covered Property Endorsement (ACPE). Docs. [27] at 7, 8, 10, 17. The Business Income provision says:

>   **A. Coverage**
>
>   >   **1.   Business Income**
>   >
>   >   >   a.   Sales Tax Revenue that would have been earned
>   >
>   >   We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of "operations" during the "period of restoration". [sic]  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

Doc. [15-1] at 30. The "Civil Authority" provision states:

>   **A.   Coverage**
>
>   . . .
>
>   >   **4. Additional Coverages**
>   >
>   >   . . .
>   >
>   >   >   **b. Civil Authority**
>   >   >
>   >   >   We will pay for the actual loss of Business Income you sustain caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than that at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage begins 72 hours after the time of that action, and will apply for a period of up to three consecutive weeks from the date on which the coverage begins.

*Id.* at 31. The Loss of Sales Tax Revenue Form, which contains the Business Income and Civil Authority provisions, *id.* at 30-31, also provides the following definitions:

>   **F.   Definitions**
>
>   >   **1.** "Operations" means:
>   >
>   >   >   **a.**  business activities occurring at the described premises; and

      **b.** The tenant ability [sic] of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" [sic] applies.

  **2.** "Period of Restoration" means the period of time that:

      **a.** Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

      **b.** Ends on the earlier of:

            **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

            **(2)** The date when business is resumed at a new permanent location.

  "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

            **(1)** Regulates the construction, use or repair, or required the tearing down of any property; or

            **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

. . .

  **4.** "Sales Tax Revenue" means Business Income that consists of:

      **a.** Sales Tax Revenue that would have been earned or incurred from the premises described in the Declarations

  **5.** "Suspension" means:

      **a.** The slowdown or cessation of business activities; or

      **b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

*Id.* at 34. Finally, the policy includes an additional provision entitled "Additional Covered Property Endorsement." Docs. [15-1] at 43, [27] at 7-8. That provision contains one sentence which states that "[t]his policy is changed to include the following even though the item(s) listed may be excluded elsewhere in this policy: Sales Tax Revenue." Doc. [15-1] at 43.

     Mt. Hawley moves for dismissal of all counts of the City's Counterclaim under Federal Rule of Civil Procedure 12(b)(6). Doc. [19].

## LEGAL STANDARD

     To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). The plaintiff generally need not allege specific facts, but "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555, n.3). Formulaic recitation of the elements of a cause of action is insufficient, *Twombly*, 550 U.S. at 555, and the Court is not required to accept as true allegations that consist of legal conclusions, *Iqbal*, 556 U.S. at 678.

## DISCUSSION

**I.     The City fails to state a claim for breach of contract.**

For a breach of contract action, the claimant must allege and prove four elements: (1) the existence and terms of a contract, (2) that claimant performed or tendered performance under the contract, (3) that opponent breached the contract, and (4) that claimant suffered damages.[1] *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. App. 2017) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)). In the insurance context, the party seeking recovery under the policy bears the initial burden of proving coverage. *Am. Fam. Mut. Ins. v. Coke*, 413 S.W.3d 362, 368 (Mo. App. 2013) (citing *Citizens Ins. Co. of Am. v. Leiendecker*, 962 S.W.2d 446, 451 (Mo. App. 1998)). Once coverage is proven, the burden shifts to the insurer to prove that a policy exclusion applies or that the insured forfeited the right to coverage by failure to abide by policy conditions. *Id.* (citing *Nichols v. Preferred Risk Grp.*, 44 S.W.3d 886, 896-97 (Mo. App. 2001)). Thus, to defeat Mt. Hawley's motion to dismiss stage, the City bears the initial burden of alleging facts that, taken as true, show that the Policy covers its claim.

Assessing the City's allegations requires the Court to construe the insurance policy. *Schmitz v. Great Am. Assur. Co.*, 2010 WL 2160748, at *3 (Mo. App. June 1, 2010) ("In the absence of a statute or public policy dictating insurance coverage, our review of whether insurance coverage is applicable is governed by a review of the underlying insurance contract.") (citing *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991)). "The interpretation of an insurance policy is a question of law[,]" *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.,* 989 S.W.2d 168, 171 (Mo. banc 1999), and Missouri courts apply general contract-interpretation principles. *Gohagan v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016) (citing *Todd v. Mo. United Sch. Ins. Council,* 223 S.W.3d 156, 160 (Mo. banc 2007)). "The policy is read as a whole to determine the parties' intent, and the language used in the policy is given its plain and ordinary meaning." *Phila. Consol. Holding Corp. v.*

---

[1] The parties agree that Missouri law applies. Docs. [19] at 4, [27] at 5-6.

*LSI-Lowery Sys., Inc.*, 775 F.3d 1072, 1077 (8th Cir. 2015) (citing *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 839-40 (Mo. App. 2011)). "In disputes over the meaning of contract language, '[t]he key is whether the contract language is ambiguous or unambiguous.'" *Gohagan*, 809 F.3d at 1015 (quoting *Todd*, 223 S.W.3d at 160). "[A]mbiguity arises in an insurance policy when, 'due to duplicity, indistinctness, or uncertainty in the meaning of the words used, the policy is reasonably open to different constructions.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Maine*, 277 S.W.3d 754, 758 (Mo. App. 2009) (quoting *Farm Bureau Town & Country Ins. Co. of Mo. v. Barker*, 150 S.W.3d 103, 106 (Mo. App. 2004), *abrogated on other grounds by Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132 (Mo. banc 2009)). Where the policy is unambiguous, the rules of construction are inapplicable and the policy must enforced as written absent a public policy to the contrary. *Id.* at 758 (quoting *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210 (Mo. banc 1992)). The Court resolves any policy ambiguities in favor of the insured. *Id.* (citing *Krombach*, 827 S.W.2d at 210).

### A. The City fails to state a claim for Business Income coverage.

Mt. Hawley argues that the City does not adequately plead a breach of contract claim under the Business Income provision because the City does not claim that it suffered decreased sales tax revenues because of "direct physical loss of or damage to property" named in the Declarations. Doc. [19] at 4-7. The City responds that no allegations of "direct physical loss of or damage to" the enumerated premises are necessary, and, even if they were necessary, the City alleged such loss or destruction. Doc. [27] at 8, 10. The City is mistaken on both points.

As a preliminary matter, the Business Income coverage provision clearly requires a suspension of operations "caused by direct physical loss of or damage to the property at [the] premises described in the Declarations . . . ." Doc. [15-1] at 30. The City's argument to the contrary disregards the plain language of the provision. *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) ("The policy here clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage."). The fact that the City does not own the premises identified in the Declarations is irrelevant. Neither Mt. Hawley nor the City disputes the rationale behind Business Income coverage; both recognize that its purpose is not to protect any property interest the City might have in the covered locations and their contents, but to safeguard the City's anticipated receipt of sales tax revenues produced by those locations and upon which the City depends. Docs. [15] ¶ 17, [27] at 8, [32] at 9.

The question remains whether the Counterclaim adequately pleads the necessary "direct physical loss of or damage to" property to trigger Business Income coverage. The City argues that

the Court should treat its allegations of loss of use of the properties as allegations of "direct physical loss of or damage to" property. *See* Doc. [27] at 13; *see also* Doc. [15] ¶¶ 31-34. Under the applicable precedent at this time, that argument fails.

The Eighth Circuit's decision in *Oral Surgeons* resolves this issue. In that case, the Court decided whether a business interruption policy containing similar coverage-triggering language protected Oral Surgeons' business income that had allegedly been lost because of a government-imposed shutdown order. *Oral Surgeons*, 2 F.4th at 1143. The policy there provided coverage for loss of business income "caused by direct 'loss' to property," and defined "loss" as "accidental physical loss or accidental physical damage." *Id.* Applying contract interpretation principles, the Eighth Circuit first determined that "the policy here clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage." *Id.* at 1144. And then the Court concluded that the requirement limited coverage for loss or damage to instances where there was "some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction." *Id.* (citing *Milligan v. Grinnell Mut. Reinsurance Co.*, 2001 WL 427642, at *2 (Iowa Ct. App. Apr. 27, 2001)); *see also Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp., Inc.*, 520 F. Supp. 3d 1158, 1174 (E.D. Mo. 2011) ("[T]he great weight of authority supports [Insurer's] position that 'direct physical loss of' requires some physical event to occur on the property itself.") (applying Missouri law); 10A Steven Plitt et al., COUCH ON INSURANCE § 148.46 (3d ed. 2021) ("The requirement that the loss be 'physical' . . . is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (footnotes omitted).

Reading the phrase "direct physical loss of or damage to" in the context of the Loss of Sales Tax Revenue Form strengthens the conclusion that entitlement to Business Income coverage depends upon some physical interference with the covered premises. *See Oral Surgeons*, 2 F.4th at 1144; *Hartford Financial*, 520 F. Supp. at 1173. Business Income coverage covers loss sustained only during a "period of restoration," Doc. [15-1] at 30, which is "the period of time that [b]egins 72 hours after the time of direct physical loss or damage . . . and [e]nds on the earlier of (1) [t]he date when the property . . . should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location," *id.* at 34. "Property that has suffered physical loss or physical damage requires restoration. That the policy provides coverage until property 'should be repaired, rebuilt, or replaced' or until business resumes elsewhere assumes physical alteration of the

property, not mere loss of use." *Oral Surgeons*, 2 F.4th at 1144; *see also Hartford Financial*, 520 F. Supp. 3d at 1173 ("The terms 'rebuilt,' 'repair,' and 'replace' in the definition of 'period of restoration' indicate that the policy provides coverage for 'the length of time set aside for physical repairs to physical loss of [sic] damage.'") (quoting *Santo's Italian Café LLC v. Acuity Ins. Co.*, 508 F. Supp. 3d 186, 199-201 (N.D. Ohio 2020)). Accepting the City's reading of "direct physical loss" as "loss of use" would render the "period of restoration" definition superfluous, because loss of use "cannot be 'repaired, rebuilt or replaced.'" *Hartford Financial*, 520 F. Supp. 3d at 1173.

The City relies upon *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794 (W.D. Mo. 2020), *K.C. Hopps, Ltd. v. The Cincinnati Ins. Co.*, 2020 WL 6483108 (W.D. Mo. Aug. 12, 2020), and *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867 (W.D. Mo. 2020), to argue that even if Business Income coverage requires "direct physical loss of or damage to" the named premises, Mt. Hawley's motion should still be denied. Doc. [27] at 10-11. Those cases are inapplicable here. In both *Studio 417* and *K.C. Hopps*, the insureds alleged that COVID-19 was present within the insured premises. *Studio 417*, 478 F. Supp. 3d at 799-800; *K.C. Hopps*, 2020 WL 6483108, at *1 (noting that the case involves the same defendant, similar insurance provisions, and similar factual allegations as *Studio 417*). The insureds in *Blue Springs* similarly alleged that "the presence of COVID-19 on and around the insured property deprived Plaintiffs of their use of their property and also damaged it." 488 F. Supp. 3d at 873. The City makes no comparable allegations.[2]

**B. The City fails to state a claim for Civil Authority coverage.**

Mt. Hawley argues that the City cannot recoup its lost sales tax revenues under Civil Authority coverage for two reasons: First, as already discussed, the City fails to allege a "direct physical loss of or damage to property." Doc. [19] at 11. Second, the City does not allege a "causal link" between the COVID-19 shut-down order and any direct physical loss or damage to property other than the insured premises. *Id.* (citing *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 687 (5th Cir. 2011)). In response, the City returns to the three cases cited above as support that it has sufficiently alleged direct "physical loss" or "physical damage" to survive a motion to dismiss. Doc. [27] at 17.

The City's argument fails. Civil Authority coverage exists when the City sustains the actual loss of Business Income: (1) "caused by action of civil authority," (2) "that prohibits access to the described premises," (3) "due to direct physical loss of or damage to property, *other than at the described*

---

[2] In a footnote, the City requests leave to amend its Counterclaim to include allegations that COVID-19 was physically present at the covered premises. Doc. [27] at 11, n.3. For reasons set forth later in this Memorandum, that request is denied.

*premises*," (5) "caused by or resulting from any Covered Cause of Loss." Doc. [15-1] at 31 (emphasis added). Nowhere in the Counterclaim does the City identify property other than the described premises. Doc. [15]. Additionally, the City fails to allege a "direct physical loss of or damage to" such other premises for the reasons set forth in Section I.A. above.

### C. The City fails to state a claim under the Additional Covered Property Endorsement (ACPE).

Extraordinarily brief, the ACPE contains one sentence: "This Policy is changed to include the following even though the item(s) listed may be excluded elsewhere in this policy: Sales Tax Revenue." Doc. [15-1] at 43. The City claims that the Policy's "Additional Covered Property Endorsement," when read in conjunction with the Policy's definition of "Sales Tax Revenue" contained in the Loss of Sales Tax Revenue Form, covers its claimed lost sales tax revenue. Doc. [27] at 7-8. Specifically, the City argues that:

> reading the definition of 'Sales Tax Revenue' with the [ACPE] [which] provides that "Sales Tax Revenue" is covered property under the Policy even though it 'may be excluded elsewhere' demonstrates that such revenues that would have been 'earned or incurred from the premises described in the Declarations' are themselves 'covered property' under this All-Risk policy.

*Id.* at 8. In reply, Mt. Hawley contends that City's expansive reading of a single short sentence is unwarranted, as "[t]he plain language of th[e] endorsement has no impact [on the policy] other than making *exclusions* inapplicable if they could be read as eliminating the coverage otherwise made available for Sales Tax Revenue." Doc. [32] at 19 (emphasis in original).

The City invites the Court to read the ACPE as defining lost sales tax revenues as "covered property," thereby entitling the City to recover those revenues without regard to the circumstance that produced the loss. Doc. [27] at 8. The Court declines for two reasons.

First, by its terms, the ACPE does not independently grant coverage for lost sales tax revenues. The policy is replete with provisions that clearly and unambiguously purport to provide coverage for certain kinds of losses.[3] For example, the Business Income provision of the Lost Sales Tax Revenue Form states that Mt. Hawley "*will pay* for actual loss . . ." of "Business Income" under certain circumstances. Doc. [15-1] at 30 (emphasis added). The Expenses to Reduce Loss coverage states

---

[3] The City repeatedly refers to this policy as "all-risk." Docs. [15] ¶ 20, [27] at 8, 11, 18. That is a reference to the policy's "Causes of Loss--Special Form," which defines "Covered Causes of Loss" as "Risks of Direct Physical Loss unless the loss is" expressly excluded or limited therein. Doc. [15-1] at 10. The Special Form does not itself authorize insurance coverage; rather, its definition of "Covered Causes of Loss" is incorporated into each of the provisions that expressly authorizes coverage. *See e.g., id.* at 30 (under Business Income coverage, the "loss or damage must be caused by or result from a Covered Cause of Loss").

that "[i]n the event of a covered loss of Business Income, we *will pay* the necessary expenses you incur, except the cost of extinguishing a fire, to avoid further loss of Business Income." *Id.* at 30 (emphasis added). The Civil Authority provision states that "[w]e *will pay* for the actual loss of Business Income you sustain caused by action of civil authority . . . ." *Id.* at 31 (emphasis added). The Alterations And New Buildings coverage provision states that "[w]e *will pay* for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to" various structures, fixtures, and machinery. *Id.* (emphasis added). The ACPE contains no language suggesting that it purports to be an additional, independent source of coverage.

Second, the City's proposed reading, which relies heavily upon the ACPE's heading, would create a conflict between the ACPE and the Loss of Sales Tax Revenue Form. *See* Doc. [15-1] at 30, 43. "[A] policy of insurance and an endorsement must be read together where there is a dispute as to its meaning, and they should be construed together unless they are in such conflict they cannot be reconciled." *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 198 (Mo. banc 1977) (citing *Cain v. Robinson Lumber Co.*, 295 S.W.2d 388, 390-91 (Mo. banc 1956)). When construing insurance policies, Missouri courts avoid interpreting provisions in a manner that renders other provisions meaningless. *Gohagan*, 809 F.3d. at 1015 (quoting *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.*, 126 S.W.3d 820, 827 (Mo. App. 2004)); *see also Progressive Cas. Ins. Co. v. Morton*, 140 F. Supp. 3d 856, 860-61 (E.D. Mo. 2015) ("Courts must 'endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant.'") (quoting *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. App. 2008)).

If one were to read the ACPE heading as defining sales tax revenue as "additional covered property" and automatically recoverable, Doc. [27] at 8, when the Loss of Sales Tax Revenue Form provides that "Business Income," defined as "Sales Tax Revenue that would have been earned," is recoverable only when it is a result of "direct physical loss of or damage to" certain property, Doc. [15-1] at 30-31, it would render those very clear coverage limitations nugatory. That conflict is unnecessary, though, because as suggested by Mt. Hawley, Doc. [32] at 13, and vindicated by the plain text, the ACPE merely makes the Policy's exclusions inoperative if they might apply to sales tax revenues otherwise meeting the requirements imposed by the coverage provisions.

II.     **The City fails to state a claim for vexatious refusal to pay.**

To state a claim for vexatious refusal to pay, the City must allege: (1) the existence of an insurance policy, (2) that Mt. Hawley refused to pay, and (3) that Mt. Hawley's refusal lacked

reasonable cause or excuse. *Macheca Transp. v. Phila. Indem. Ins. Co.*, 649 F.3d 661, 674 (8th Cir. 2011) (citing *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006)). "[A]n insurer is permitted to question or contest its liability if it has reasonable cause to believe, and does believe, that it has no liability under the policy and that it has a meritorious defense." *Drury Co. v. Mo. United Sch. Ins. Couns.*, 455 S.W.3d 30, 38 (Mo. App. 2014) (quoting *Legg v. Certain Underwriters at Lloyd's of London*, 18 S.W.3d 379, 387 (Mo. App. 1999)). "The test for a vexatious refusal claim is not the final resolution of the coverage issues but how willful and unreasonable the insurer's refusal was as the facts appeared to a reasonable and prudent person at the time the insurer was asked for coverage[]" *Legg*, 18 S.W.3d at 387 (quoting *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 55 (Mo. App. 1998)). "Thus, 'where there is an open question of law or fact relating to a claim under an insurance policy, the insurer may insist upon a judicial determination of those questions without being penalized for vexatious refusal to pay.'" *Drury Co.*, 455 S.W.3d at 38 (quoting *Legg*, 18 S.W.3d at 387).

The City fails to establish the third element. Absent circumstances not alleged here, when a claimant fails to show a right to coverage under an insurance policy, the claimant cannot thereafter plead that the insurer lacked a reasonable basis to refuse the claim. *Hartford Financial*, 520 F. Supp. 3d at 1174 ("Because the Court concluded that the insurance policies did not provide Plaintiffs coverage, Defendants had reasonable cause to refuse to pay Plaintiffs' claims. Thus, Plaintiffs cannot establish a vexatious refusal to pay claim.") (citing *Smith v. Zurich Am. Ins. Co.*, 2017 WL 3168566, at *5 (E.D. Mo. July 26, 2017)). Because the City fails to plead coverage under the policy, the City also fails to plead that Mt. Hawley's refusal to pay was unreasonable.

### III. The City fails to state a claim for fraudulent inducement/fraudulent misrepresentation.

The City also alleges a claim for fraudulent misrepresentation, stating that (1) Mt. Hawley affirmatively represented at the time of issuance and at each renewal thereafter that the Policy would provide coverage for loss of sales tax revenues regardless the cause of the loss, (2) Mt. Hawley's denial proves the representations were false, (3) the representations were material in inducing the City's decision to purchase the Policy, and (4) Mt. Hawley made the representations with intent to cause the City to purchase the Policy. Doc. [15] ¶¶ 49-58. The City fails to state a fraudulent misrepresentation claim for two independent reasons: First, the City failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b), and second, Missouri law bars the assertion of a tort claim that is dependent upon the breach of contract claim.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b)'s 'particularity requirement demands a higher degree of notice than that required for other claims, as it is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations.'" *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (quoting *U.S. ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 888 (8th Cir. 2003)). "In other words, the complaint must plead the 'who, what, where, when and how' of the alleged fraud." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *United States ex rel. Joshi*, 441 F.3d at 556). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Id.* (quoting *Schaller Telephone Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)).

The City alleges only the "when," "why," and "what," failing to identify the "who." The City erroneously relies upon *Ward Hyundai, Inc. v. Zurich Am. Ins. Co.*, 2015 WL 249355 (E.D. Mo. Jan. 20, 2015), in support of its position that Rule 9(b) was nonetheless met. Doc. [27] at 22. In *Ward Hyundai*, the plaintiff specifically identified the defendant's agent responsible for making the allegedly fraudulent representations. 2015 WL 249355, at *4 (noting that plaintiff identified "Foshee" as the defendant's agent who made the fraudulent statements). Here, the City identifies only Mt. Hawley, a corporate entity, as the speaker. Doc. [15] ¶ 50. Because the City fails to identify with any degree of specificity the agent responsible for Mt. Hawley's allegedly fraudulent statements, Mt. Hawley lacks the ability to respond and prepare a defense against the fraud charge. *See Com. Prop. Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995) (noting that when pleading fraud, the circumstances to be alleged include "the time, place and contents of false representations, as well as the identity of the person making the representation and what was obtained or given up thereby") (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)); *see also Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 760, 771 (D. Minn. 2019) (concluding that plaintiffs did not plead fraud with particularity when they failed to identify corporate defendant's agent responsible for the fraudulent statements).

The City's fraud claim is also barred by Missouri law. "Generally, 'insurance is a matter of contract, and [it] is governed by the rules applicable to contracts and that any claim or suit by either party to an insurance contract must be based on the policy as issued.'" *Ward Hyundai*, 2015 WL 249355, at *2 (quoting *Hartford Accident & Indem. Co. v. Farmington Auction, Inc.*, 356 S.W.2d 512, 518-19 (Mo. App. 1962)). "Missouri courts allow for tort claims by an insured against an insurer where: (1) the claim is for bad faith refusal to settle a claim brought by a third party; or (2) the claim is based on conduct distinct from conduct constituting a breach of the insurance contract." *Sentry Select Ins.*

*Co. v. Hosmer*, 2009 WL 2151557, at *8 (W.D. Mo. July 17, 2009) (citing *Richey v. Philipp*, 259 S.W.3d 1, 5-6 (Mo. App. 2008) (overruled on other grounds)).

The City alleges that Mt. Hawley's alleged assertions that the Policy provides categorical coverage for lost sales tax revenues were false because Mt. Hawley ultimately denied the May 21, 2020, claim. Doc. [15] ¶¶ 50-51. By squarely resting its falsity allegation on Mt. Hawley's refusal to pay, the City has based its fraudulent misrepresentation claim on the breach of contract claim. *Compare Ward Hyundai*, 2015 WL 249355, at *2-*3 (rejecting defendant's recharacterization of plaintiff's fraudulent misrepresentation claims as breach of contract claims because plaintiff admits there is no coverage under the contract), *with Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 290 (Mo. App. 2008) (dismissing an insured's fraud claim against insurer because it is "based upon [insurer's] refusal to pay and [is] not based on conduct distinct from conduct that merely constitutes a breach of contract").

### IV.    The City fails to state a claim for negligent misrepresentation.

The City's negligent misrepresentation claim must also be dismissed because it is not independent from the City's breach of contract claim. "A party complaining of a breach of contract cannot also bring a tort claim dependent on the same elements as the contract claim." *Lloyd's Acceptance Corp. v. Affiliated FM Ins. Co.*, 2006 WL 1722278, at *2 (E.D. Mo. June 19, 2006). Like the claim in *Lloyd's Acceptance Corp.*, the City alleges that Mt. Hawley was negligent by representing that the Policy provided categorical coverage for lost sales tax revenues and thereafter refusing to cover the claim. Doc. [15] ¶¶ 60-64. Alleging that an insurer negligently represented that it would pay and thereafter failed to pay does not state a claim independent of the contract claim. *See Lloyd's Acceptance Corp.*, 2006 WL 1722278, at *3.

### V.    The City fails to state a claim for breach of fiduciary duty.

Finally, the City asserts that Mt. Hawley owed it a fiduciary duty by virtue of its "greater knowledge and power with respect to the insurance industry," and that it breached that duty by issuing a policy that did not provide the City's desired coverage. Doc. [15] ¶¶ 67, 69.

A breach of fiduciary duty claim requires allegations showing: "(1) the existence of a fiduciary relationship between the parties, (2) a breach of the fiduciary duty, (3) causation, and (4) harm." *Pool v. Farm Bureau Town & Country Ins. Co. of Mo.*, 311 S.W.3d 895, 906-07 (Mo. App. 2010) (quoting *Grewell v. State Farm Mut. Auto. Ins. Co.*, 162 S.W.3d 503, 508 (Mo. App. 2005)). The City's allegations fail to satisfy the first element.

"'A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former.'" *Pool*, 311 S.W.3d at 907 (quoting *Shervin v. Huntleigh Securities Corp.*, 85 S.W.3d 737, 740-41 (Mo. App. 2002)). A "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary which is recognized by the law as justifying such reliance." *Id.* at 907 (quoting *Farmers Ins. Co., Inc. v. McCarthy*, 871 S.W.2d 82, 87 (Mo. App. 1994)). "Missouri law is clear that 'an insurer, who is entrusted to defend a claim on behalf of the insured, acts in a fiduciary capacity.'" *Id.* (quoting *Grewell*, 162 S.W.3d at 509). This is so because, "where a third party is suing an insurer's policy holder, it is the insurance company's control over the claim that creates a fiduciary relationship between insurer and insured." *Id.* A fiduciary relationship is absent where an insured sues its insurer for denying a claim, as "[s]uch claims are not controlled by the insurer to the exclusion of the insured nor is the specter of judgment against an insured in excess of coverage a present danger if the insurer fails to exercise good faith." *Id.* (quoting *Duncan v. Andrew Cnty. Mut. Ins. Co.*, 665 S.W.2d 13, 19 (Mo. App. 1983)). Instead, "[i]n first party claims by insureds against insurers under policies affording coverage for loss or damage to property and related types of insurance, the parties occupy a contractually adverse or creditor-debtor status as opposed to a fiduciary relationship." *Id.* (quoting *Duncan*, 655 S.W.2d at 19).

Because this lawsuit is a first party claim by an insured against its insurer, the City and Mt. Hawley share an adversarial and not a fiduciary relationship; therefore, the City fails to state a claim for breach of fiduciary duty.

**VI.    The City's request for leave to amend is futile.**

The City also makes a passing request for leave to amend its Counterclaim to include allegations that COVID-19 was present upon the premises. Doc. [27] at 11, n.3. Mt. Hawley contends that the request must be denied as futile. Doc. [32] at 11.

While district courts "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), "plaintiffs do not enjoy 'an absolute or automatic right to amend'" a deficient complaint. *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (quoting *U.S. ex rel. Lee v. Fairview Health Sys.*, 413 F.3d 748, 749 (8th Cir. 2005)). "A district court's denial of leave to amend a complaint may be justified if the amendment would be futile." *Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 954 (8th Cir. 2018) (quoting *Greier v. Mo. Ethics Comm'n*, 715 F.3d 674, 678 (8th Cir. 2014)). "An amendment is futile if the amended claim 'could not withstand a motion to

dismiss under Rule 12(b)(6).'" *Id.* (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 719 (8th Cir. 2014)).

Granting leave here would be futile. The Court agrees with those cases addressing contract provisions comparable to the provisions at issue in this case and concludes that the presence of COVID-19 does not cause a "direct physical loss of or destruction to property" for purposes of Business Income or Civil Authority coverage. *See, e.g., Lindenwood Female College v. Zurich Am. Ins. Co.*, 2021 WL 5050065, at *4-*5 (E.D. Mo. Nov. 1, 2021) (concluding that COVID-19's presence in the premises caused only a "transitory reduction of the properties' functionality" detached from any physical alteration or tangible impact); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401-03 (6th Cir. 2021); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021) (holding that the presence of lingering viral particles within the premises does not cause physical damage or loss to the property).

*Santo's Italian Café* is instructive. In that case, an Ohio restaurant sued its insurer for coverage under its business interruption policy for revenues lost on account of a COVID-19 shutdown order.[4] *Stanto's Italian Café*, 15 F.4th at 400. The policy language in *Santo's Italian Café* is practically identical to the Loss of Sales Tax Revenue Form. *Compare id*, *with* Doc. [15-1] at 30, 34. Applying a plain language approach to contract interpretation, the Sixth Circuit concluded that a shutdown order did not constitute a direct physical loss or damage to the insured property. *Santo's Italian Café*, 15 F.4th at 401 ("The restaurant has not been tangibly destroyed, whether in part or in full."). Additionally, the Sixth Circuit addressed, albeit in dictum, the question of whether the presence of COVID-19 in the restaurant triggered coverage and arrived at the same conclusion. *Id.* at 402. Simply put, "the novel coronavirus [does] not physically affect the property in the way, say, fire or water damage would." *Id.* That conclusion comports with the traditional uses of commercial property insurance, as such policies, even though termed "all-risk," "still cover only risks that lead to tangible 'physical' loss or damages, say by fire, water, wind, freezing and overheating, or vandalism." *Id.* at 403. (citing 10A Steven Plitt,

---

[4] The City repeatedly suggests that cases involving business interruption policies are distinguishable from this case by the fact that the former concern policies covering anticipated sales revenues at privately-owned real properties while the Loss of Sales Tax Revenue Form protects a local government's anticipated receipt of tax revenues from designated premises not owned by the government. Docs. [27] at 8-9, [47-1] at 1. The City offers no persuasive justification for that distinction. As indicated above, the purpose of the Loss of Sales Tax Revenue Form's coverages, like run-of-the-mill business interruption policies, is to protect the insured entity's anticipated revenues should the premises suffer physical damage or destruction. The City gives no persuasive reason to differentiate taxes anticipated by a government from sales revenues anticipated by a private business in this context.

et al., COUCH ON INSURANCE § 148:3; 4 Philip L. Bruner & Patrick J. O'Connor, BRUNER & O'CONNOR ON CONSTRUCTION LAW § 11:39 (2021); 2 Myron Kove et al., REAL ESTATE TRANSACTIONS § 18:95 (2021) (explaining that property insurance covers "damages or destruction by the action of the elements" and has its origins in coverage for damage by fire or lightning)). "In each case, the subject property suffers a direct physical change, whether by damage to it that requires repair or the total loss of it that requires replacement." *Id.* As such, the policies "do not cover losses indirectly caused by a virus that injuries people, not property." *Id.*

## CONCLUSION

Each of the City's five counts fails to state claim upon which relief could be granted, and amendment would be futile. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Dismiss Defendant's Counterclaim, Doc. [19], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Counterclaim, Doc. [15], is **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that Defendant's request for leave to amend its Counterclaim, Doc. [27] at 11 n.3, is **DENIED**.

Dated this 14th day of March 2022.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE